IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn

Civil Action No. 06-cv-01598-REB-CBS

HELENA C. HATCH,

      Plaintiff,

v.

FEDERATED RETAIL HOLDINGS, INC., a New York corporation,
d/b/a THE MAY DEPARTMENT STORES COMPANY, and
METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation,

      Defendants.

---

## ORDER RE: BRIEFS ON ADMINISTRATIVE RECORD

---

Blackburn, J.

      This matter is before me on the **Plaintiff's Opening Brief** [#53][1] filed November 25, 2009.  The plaintiff seeks review and reversal of the decision of the defendants to deny further disability benefits to the plaintiff under a plan regulated by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 - 1461. The defendants filed a response [#57], and the plaintiff filed a reply [#58].  I deny the relief sought by the plaintiff.

## I.  JURISDICTION

      I have jurisdiction over this case under 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) and (f) (ERISA).

---

[1]  "[#53]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

## III.  STANDARD OF REVIEW

This lawsuit arises out of the termination by defendant Metropolitan Life Insurance Company (MetLife) of the disability benefits of the plaintiff under a long-term disability (LTD) plan provided by the plaintiff's quondam employer, The May Department Stores.  The plan is funded by defendant the Long-Term Disability Plan of the May Department Stores.  MetLife is the claim administrator for the plan and is responsible for determining claims for long term disability benefits.  The plaintiff Helena Hatch brings her claims against the defendants under ERISA.

ERISA provides a detailed and comprehensive set of federal regulations governing the provision of benefits to employees by employers.  Under 29 U.S.C. § 1132(a), part of ERISA, a plan beneficiary has the right to review of benefit denials and terminations in federal court . The statute does "not establish the standard of review for such decisions."  ***Chambers v. Family Health Plan Corp.***, 100 F.3d 818, 824-25 (10th Cir.1996).

However, in ***Firestone Tire & Rubber Co. v. Bruch***, 489 U.S. 101 (1989), the Supreme Court established the basic framework for determining the standard of review in ERISA cases that challenge the denial or termination of benefits.  "(A) denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  ***Firestone***, 489 U.S. at 115.  If the plan provides for such discretion, then the proper standard of review is abuse of discretion.  ***Id***.  Ms. Hatch concedes that the Plan at issue here gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits, and the abuse of discretion standard of review is applicable.

Generally, the abuse of discretion standard is applied by determining whether or not the Plan's denial of benefits was arbitrary and capricious. ***Kimber v. Thiokol Corp.***, 196 F.3d 1092, 1097 (10th Cir. 1999).  Under the arbitrary and capricious standard of review, the Plan's decision need not be the only logical decision nor even the best decision.  Rather, the decision need only be sufficiently supported by facts known to the Plan to counter a claim that the decision was arbitrary or capricious.  The decision will be upheld unless it is not grounded on any reasonable basis. ***Kimber***, 196 F.3d at 1098.  The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness – even if on the low end." ***Id.*** (quoting ***Vega v. National Life Ins. Serv., Inc.***, 188 F.3d 287, 297 (5th Cir. 1999)).

The United States Supreme Court has outlined several considerations that are relevant to a reviewing court's application of the arbitrary and capricious standard. ***Metropolitan Life Ins. Co. v. Glenn***, 554 U.S. 105, 115-119 (2008).  These factors include: 1) any potential conflict of interest; 2) the quality and quantity of the medical evidence; 3) whether the plan or claims administrator provided greater emphasis to medical reports favoring a denial of benefits as opposed to those supporting a determination of disability; 4) whether the plan or claims administrator provided its reviewing physicians and other experts with all of the relevant evidence; 5) whether the plan or claims administrator "has taken active steps to remove bias and promote accuracy;" and 6) whether the plan or claims administrator considered any social security disability determination, including whether the administrator encouraged the

claimant to apply for social security disability benefits, and then ignored a social security disability determination. *Id*. This list of considerations is not exhaustive.

In this case, the administrative record [#52] provides all of the relevant facts, and there is no contention that the administrative record is incomplete or inaccurate. The undisputed and relevant facts are established. The only remaining question is an evaluation of MetLife's benefits determination under the arbitrary and capricious standard. After this review is complete, either the plaintiff or the defendants necessarily will be entitled to judgment as a matter of law.

### III.  FACTS

Ms. Hatch worked as a Human Relations Manager for the May Department Stores. In late 2002, she began to suffer from generalized muscle pain. In late March 2003, she was diagnosed with myositis, an autoimmune disorder. Dr. Vance Bray made the diagnosis. MetLife does not dispute this diagnosis. By May 2003, Ms. Hatch's condition had worsened. Her last day on the job was May 15, 2003.

Ms. Hatch was covered under the Long Term Disability Plan of the May Department Stores Company (the Plan). The Plan is regulated by ERISA. Ms. Hatch was approved for benefits under the plan beginning August 13, 2003. R0281.[2] Under the terms of the Plan applicable at that time, total disability is defined as "your inability to perform the normal functions of your regular occupation during the first two years and 90 days of your absence from work due to disability." R0281. Ms. Hatch received benefits under the Plan until August 13, 2005.

Under the terms of the Plan, the applicable definition of total disability changed

_____

[2]  I refer to the administrative record [#52] by page number, e.g., R0001.

after Ms. Hatch had received benefits for two years.  As of August 13, 2005, the Plan

defined total disability in the case of Ms. Hatch as "being completely unable to perform

any and every duty of any job for wage or profit that you are reasonably qualified by

education, training or experience to perform."  R0281.  As August 13, 2005,

approached, MetLife began an evaluation of Ms. Hatch's claim.  Ultimately, MetLife

denied Ms. Hatch coverage under the Plan beyond August 12, 2005.  R0113 - R0115.

The denial was based on MetLife's conclusion that Ms. Hatch no longer met the

applicable definition of totally disabled.  R0113 - R0115.  In this case, Ms. Hatch

challenges the denial of benefits beyond August 13, 2005, and argues that MetLife's

decision to deny further benefits was arbitrary and capricious.

        While she was receiving benefits, MetLife referred Ms. Hatch to a company

called Occudata, which provides legal representation for individuals making Social

Security disability claims.  On April 20, 2005, an administrative law judge rendered a

decision on Ms. Hatch's Social Security disability claim. R0165 - 0168. Based in

significant part on a "report from consultative examiner Nathan Clifford, M.D., who

examined [Ms. Hatch] in February 2005," the administrative law judge found that Ms.

Hatch had been under a disability, as defined by the Social Security Act, since May 15,

2003.  R0166, R0168.  The administrative law judge found that her disability had

continued through at least the date of his decision, April 20, 2005. R0168.  In

determining disability, the administrative law judge applied a standard under which a

claimant's ability to work is determined based on the claimant's ability to work eight

hours a day, five days a week.  R0166. The award of Social Security disability benefits

to Ms. Hatch reduced the amount the Plan was obligated to pay Ms. Hatch.  The Social

Security decision did not impact MetLife financially.

Generally, the medical records for the period from August 2003 through August 2005 show many ups and downs in Ms. Hatch's condition, including varied subjective reports from Ms. Hatch to her doctors about how she felt.  During this period, she often suffered constraints on her activity, very limited endurance, and moderate to severe muscle and joint pain.  Information about Ms. Hatch's condition in the period leading up to and including August 13, 2005, is the most important information in the file.  That information is the basis for MetLife's denial of benefits and also is the basis for Ms. Hatch's contention that MetLife's decision was arbitrary and capricious.

In August 2004, Ms. Hatch stopped taking the medications prescribed for her myositis because of complications related to a surgery for conditions unrelated to her myositis.  In October 2004, Dr. Bray recommended that Ms. Hatch resume use of specific medications to treat her myositis.  R0105.  In December 2004, Dr. Bray reported that Ms. Hatch did not appear to be "under adequate control with regards to her polymyositis."  R0101.  He reported that she was experiencing significant muscle pain, and he described how the pain was most severe late in the day and through the night.  R0101 - R0102.  He reported and opined that the "level of pain would prevent her from returning to work."  R0101.

March 3, 2005 brought a more positive report from Dr. Bray.  On March 3, Dr. Bray reported that Ms. Hatch was "doing very well" on the medication Enbrel.  R0098.  "She still has increased myalgias after increased physical activity, but in general is able to pace herself. She can tolerate about two hours of exertion each day, but if she does more than this, she will have a marked increase in pain and fatigue."  R0098.  "On

examination, she appears very healthy and vibrant." R0098.

June 2, 2005, also brought a positive report. On that day, Dr. Bray reported that

> Mrs. hatch feels very well. She generally has noted excellent strength and
> minimal muscle pain. She will have an increase in muscle pain after
> physical activities such as pulling weeds or carrying a heavy object. She
> also will have an increased amount of pain after emotional stress, both
> happy and sad. Nonetheless, she is doing well.

R0121 - R0122.

In mid-July 2005, Dr. Bray completed a questionnaire and provided information

about Ms. Hatch to MetLife. R0107, R0120. He reported that she was not able to work

full time or to work at any gainful occupation. R0120. He reported high fatigue levels

and increased pain with any activity lasting two hours or more. R0107. He also

reported objective findings in support of his diagnosis, noting "tenderness to palpation of

her muscles" and pain in her knees. R0107. In addition, he stated limitations on Ms.

Hatch's activity. He noted that Ms. Hatch is "very fatigued" and suffers "increased pain

with any activity lasting 2 hours or longer." R0107.

In May 2005, Met Life began its reevaluation of Ms. Hatch's claim, anticipating

the coming change in the applicable definition of the term totally disabled. R0042. On

July 21, 2005, a MetLife nurse consultant concluded that Ms. Hatch did not meet the

new definition of totally disabled.

> The objective records support a diagnosis of polymyositis, which per office
> visit of 6/2/05 appears very stable. Per Dr. Bray's notes, [Ms. Hatch]
> states able to weed garden and gets increased muscle pain with
> increased activities. [Dr. Bray] states [Ms. Hatch] is stable on Enbrel.
> There is another note signed by Dr. Bray on 6/2/05, which states that [Ms.
> Hatch] is extremely fatigued, and has tenderness to muscles on palpation.
> Neither of these complaints are documented on the office visits. [Nurse
> consultant] recommends the objective records submitted for review [do]
> not substantiate [Ms. Hatch's] inability to function at any occ.

R0049 - R0050. The letter to Ms. Hatch stating the basis for MetLife's decision to terminate her benefits recites roughly the same information as the basis for the decision.  R0113 - R0114.

On October 25, 2005, Ms. Hatch filed an appeal of this decision.  She relied on a statement from Dr. Dawson, a brochure about myositis, a note by Dr. Bray describing Ms. Hatch's August 17, 2005, office visit, and the decision of the administrative law judge concerning Ms. Hatch's Social Security benefits.

Dr. Dawson's statement, which appears to have been made in October 2005, defers to Dr. Bray concerning Ms. Hatch's ability to work as a Human Resources Manager.  R0083.  Dr. Dawson indicates severe restrictions on Ms. Hatch's physical abilities.  R0084.  The statement does not indicate that Dr. Dawson examined Ms. Hatch and does not state the bases for Dr. Dawson's conclusions about the level of restriction on Ms. Hatch's physical abilities. R0083 - R0084.  Because Dr. Dawson's statement does not state the basis for her conclusions, her October 2005 report does not carry significant weight.  I note that Dr. Bray frequently updated Dr. Dawson about Ms. Hatch's condition.  *See, e.g.*, R0098, R0101.  However, that fact does not establish a basis for Dr. Dawson's opinions as expressed in her October 2005 statement.

MetLife did not rely on the brochure about myositis.  It did not need to, and it should not have. The brochure describes generally the symptoms of the disease, but says nothing about Ms. Hatch in particular.  R0085.

Dr. Bray's August 17, 2005, report states:

Mrs. Hatch continues to experience severe muscle pain, joint pain and fatigue related to her polymyositis.  She has only about one hour of stamina for performing any work-related activities.  After this time, she is markedly fatigued and notices increased pain . . . .She is not doing most

> of her household chores . . . . Last evening, she was unable to clean the
> table after dinner because of pain and fatigue. * * * * Mrs. hatch continues
> to demonstrate active inflammatory disease related to polymyositis.  This
> is causing her muscle pain and fatigue.  I believe that she is totally
> disabled because of this problem.

R0086 - R0087.  The content of the determination of the administrative law judge

concerning Social Security benefits is as summarized above.

Given this information, MetLife referred Ms. Hatch's file to a consulting physician,

Dr. Tracey Schmidt.  In her report, Dr. Schmidt reviewed the records of Ms. Hatch's

treatment.  R0075 - R0077. Noting that the key question was Ms. Hatch's functionality

from August 12, 2005, and beyond, Dr. Schmidt summarized the content of the medical

reports discussed above.  R0075 - R0077.  She noted the positive reports from May and

June 2005 and the negative report from August 17, 2005.  Addressing the August 17,

2005, report, Dr. Schmidt noted: (a) there are no reports indicating treatment between

June 2, 2005, and August 17, 2005; (b) although Ms. Hatch reported joint and muscle

pain on August 17, 2005, "there was no evidence of synovitis or muscle weakness on

exam;" (c) although Ms. Hatch reported severe pain during this visit, there is no

indication that her medications were changed; and (d) the reports of May 3, 2005, and

June 3, 2005, describing Ms. Hatch's activities, suggest more than sedentary activities.

R0075 - R0077.  Dr. Schmidt does not mention the award of Social Security benefits to

Ms. Hatch.  Dr. Schmidt concluded that Ms. Hatch's file "lacks sufficient medical [*sic*] to

support objective evidence of physical functional capacity impairment from a sedentary

occupation with ability to change positions as needed."  R0076.

MetLife's letter to Ms. Hatch concerning her appeal again summarizes Ms.

Hatch's medical records, concentrating on the records from 2005.  R0072 - R0074.  In

addition, the letter summarizes Dr. Schmidt's report. R0073 - R0074.  Based on that

information, MetLife upheld the denial of benefits, concluding that the "file lacks

objective findings that would indicate an impairment of such a severity as to preclude

you from performing in a sedentary-type job."  R0072 - R0074.

## IV.  ANALYSIS

Ms. Hatch addresses several of the relevant factors and, based on those factors,

argues that MetLife's decision, particularly its decision on Ms. Hatch's appeal, was

arbitrary and capricious.  I address in turn each factor raised by Ms. Hatch.

### A.  Application of the Definition of Total Disability

MetLife determined that Ms. Hatch is not totally disabled.  The Plan defined total

disability as "being completely unable to perform any and every duty of any job for wage

or profit that you are reasonably qualified by education, training or experience to

perform."  R0281.  Applied literally, Ms. Hatch argues, this language would mean that

any simple job one might hypothesize, such as a job making a phone call, could be

seen as a job Ms. Hatch could perform.  Such an interpretation of the Plan, Ms. Hatch

contends, would render its coverage illusory.

Addressing a similarly broad definition of totally disabled, the United States Court

of Appeals for the Tenth Circuit held that a definition of total disability may not be read

to exclude a person who can do any job, no matter how minor the job.

> We believe that the policy concerns which underlie ERISA would be
> severely undermined if we endorsed a literal reading of the plan's terms.
> Thus we join the reasoning of the Eleventh Circuit and hold that a
> reasonable interpretation of a claimant's entitlement to payments based on
> a claim of total disability must consider the claimant's ability to pursue
> gainful employment in light of all the circumstances. The standard to be
> applied will require the claimant to establish <u>a physical inability to follow
> any occupation from which he can earn a reasonably substantial income</u>

<u>rising to the dignity of an income or livelihood,</u> although the income may not be as much as was earned prior to the disability. If plaintiff meets his burden, recovery may not be denied on the basis of overly restrictive interpretations of the plan's language.

***Torix v. Ball Corp.***, 862 F.2d 1428, 1431 (10th Cir. 1988) (emphasis added).  The definition of total disability at issue in ***Torix*** was, in relevant part, "totally and presumably permanently prevented from engaging in any occupation or employment for wages or profit as a result of bodily injury or disease." ***Id***. at 1429 n. 1.

MetLife argues that the limitation expressed in ***Torix*** is not applicable here because the Plan's definition of total disability is different than that at issue in ***Torix***. Although the definitions do differ in some ways, I conclude that the limitation stated in ***Torix*** is applicable.  Taken literally, the phrase "any and every duty of any job for wage or profit [for which] you are reasonably qualified," as used in the Plan, could be read to include a sedentary job requiring 30 minutes of work per day, five days per week.  I conclude that such a broad interpretation of an ERISA regulated plan is not permissible.

However, the administrative record here does not show that MetLife applied an overly restrictive definition of total disability.  MetLife's letter denying Ms. Hatch's appeal states MetLife's ultimate conclusion.  MetLife found that Ms. Hatch's file lacked "objective findings that would indicate an impairment of such a severity as to preclude you from performing in a sedentary-type job." R0074.  This conclusion does not evince use of an unduly restrictive interpretation of the Plan's definition of total disability.

### B.  Insistence on Objective Evidence

Ms. Hatch argues that MetLife insisted improperly on objective evidence of symptoms that are inherently subjective, such as pain.  MetLife counters that it sought objective evidence of a disabling impairment, and it found none in the record.

Subjective and objective evidence of total disability must be considered in a disability decision regulated by ERISA.  ***See Ray v. UNUM Life Ins. Co. of Am.***, 224 F. App'x 772, 786-87 (10th Cir. 2007) (We permit consideration of subjective evidence of disability in ERISA cases) (***citing  Clausen v. Standard Ins. Co.***, 961 F.Supp. 1446, 1456 (D.Colo.1997) (insurer's attempt to ignore diagnosis of chronic fatigue syndrome and to instead require objective evidence of distinct physical disease violates established law in circuit)).  However, subjective evidence need not be accepted at face value.  Rather, subjective evidence must be evaluated along with all other evidence relevant to the determination of total disability.  When a claimant's subjective, uncorroborated complaints of pain constitute the only evidence of an ailment's severity, the medical inquiry is intertwined with questions of the claimant's credibility.  Such credibility questions are the province of the Plan administrator.  ***Meraou v. Williams Co. Long Term Disability Plan***, 221 F. App'x 696, 705 (10th Cir. 2007).

In this case, Ms. Hatch had reported severe muscle and joint pain to her doctor regularly from 2003 to through 2005.  In March 2005, she reported an ability to tolerate about two hours of exertion per day without a marked increase in pain and fatigue. R0098.  In June 2005, her muscle pain was described as "minimal," but it was noted that the pain would increase after physical activity, such as pulling weeds or carrying a heavy object, or with emotional distress. In August 2005, she reported about one hour of stamina for work related activities.  These are subjective reports.  However, these reports are consistent with the undisputed diagnosis of myositis or polymyositis.

The objective observations reflected in Dr. Bray's examination on August 23, 2005, are generally consistent with Ms. Hatch's subjective reports on that date.  R0086,

¶ 2.  The objective observations reflected in Dr. Bray's examination on June 2, 2005, tend to minimize the pain experienced by Ms. Hatch at that time.  Rather, that report generally reflects that Ms. Hatch was doing very well.  R0121 - 0122.  The objective observations reflected in Dr. Bray's examination of March 3, 2005, reflect normal proximal muscle strength and a negative fibromyalgia examination.  R0098.  These objective observations tend to minimize the pain experienced by Ms. Hatch at that time.

MetLife was left to judge the objective evidence and the subjective evidence.  It is apparent that Dr. Bray's ability to provide objective evidence which confirmed the subjective reports of pain was limited significantly.  However, Dr. Bray's reports do reflect an effort to provide some objective confirmation.  Those objective symptoms varied over time, as did many of Ms. Hatch's subjective reports of her symptoms.  In this circumstance, assessment of the reports of subjective symptoms is intertwined with Ms. Hatch's credibility.  Ultimately, Dr. Schmidt assessed the credibility of Ms. Hatch's reports of pain, in light of the other evidence reflecting Ms. hatch's condition between May 3, 2005, and August 17, 2005.  R0076 - R0077.  Implicit within her assessment is her conclusion that the subjective reports of Ms. Hatch during this time are less credible in light of the objective evidence reflected in the medical record during the same period.  R0076 - R0077. MetLife's letter stating its denial of Ms. Hatch's claim for continued benefits takes essentially the same position.

Ms. Hatch argues that "(i)nsistence on objective proof of inherently subjective effects of an illness is nothing more than a gaping escape clause from MetLife's obligations under its disability policies."  *Reply* [#58], p. 4.  The record does not demonstrate that MetLife insisted on the impossible: objective proof of facts that can be

shown only via subjective reports.  Rather, MetLife evaluated the relevant subjective

reports in light of the relevant objective evidence and, considering both the subjective

and objective evidence, concluded that Ms. Hatch had not demonstrated that she was

totally disabled.  Such a reticulated evaluation of the objective and subjective evidence

is not arbitrary and capricious.  This factor does not weigh in favor of a finding that

MetLife's decision was arbitrary and capricious.

### C.  Selective Use of the Medical Record

Ms. Hatch argues also that MetLife gave greater emphasis to medical reports

favoring a denial of benefits than reports favoring a finding of disability. Such an

emphasis by a claims administrator, such as MetLife, can be seen as a factor that tends

to indicate an abuse of discretion. *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585

F.3d 1311, 1326 (10th Cir. 2009) (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S.

105 (2008)).  In this case, given the broadened definition of disability that became

effective in August of 2005, there are significant medical records of Ms. Hatch which

weigh in favor of a finding of disability and significant records which weigh against such

a finding.

Here, I conclude that MetLife considered all relevant records and information.

MetLife did not fail or refuse to consider records or information favorable to Ms. Hatch.

MetLife did not prejudge its review of the relevant records and information. MetLife did

not irrationally, arbitrarily, or capriciously consider or weigh the plethora of available

information. Thus, I conclude that, contrary to the assertion of Ms. Hatch, MetLife did

not cherry pick the information to support its ultimate conclusion that Ms. Hatch was not

disabled under the operative definition. Therefore, consideration of this issue weighs in

favor of a finding that MetLife did not act arbitrarily and capriciously.

### D.  Inconsistent Positions Regarding Social Security Disability

To rehearse, MetLife encouraged Ms. Hatch to apply for Social Security disability benefits. The Plan's obligations to Ms. Hatch were reduced when Ms. Hatch was awarded Social Security disability benefits.  The decision did not affect MetLife financially.

When she appealed MetLife's initial denial of benefits, Ms. Hatch provided MetLife with a copy of the decision of the administrative law judge awarding benefits to Ms. Hatch.  Based in significant part on a "report from consultative examiner Nathan Clifford, M.D., who examined [Ms. Hatch] in February 2005," the administrative law judge found that Ms. Hatch had been under a disability, as defined by the Social Security Act, since May 15, 2003.  R0166, R0168.  The administrative law judge found that her disability continued through at least the date of his decision, April 20, 2005. R0168.  There is no indication that MetLife considered the decision of the administrative law judge when MetLife evaluated Ms. Hatch's appeal of the denial of benefits.

MetLife's failure to consider and address the Social Security decision suggests procedural unreasonableness in its decision making process. ***Metro. Life Ins. Co. v. Glenn***, 554 U.S. 105, 118 (2008).  Although the standard applied by the administrative law judge may be somewhat different than the standard applicable under the Plan, a finding of disability under the Social Security standard is relevant to MetLife's disability determination.  The window of time examined by the administrative law judge –  May 15, 2003, to April 20, 2005 – is directly relevant to a determination of Ms. Hatch's condition in August 2005.  At a minimum, the award of Social Security benefits should

have been addressed and considered.  It appears that MetLife summarily rejected the value of the administrative law judge's decision.  That unexplained rejection weighs in favor of a finding of arbitrary and capricious action.

### E.  Bias of Reviewing Physician

Ms. Hatch argues that the record demonstrates that Dr. Schmidt is biased in favor of MetLife, and MetLife was aware of this bias.  Ms. Hatch relies first on her criticisms of Dr. Schmidt's report.  Second, MetLife cites a list of cases in which Dr. Schmidt gave an opinion in favor of MetLife.  *Opening brief*, Exhibit A [#53-1].  Certainly, one reasonably can take a position contrary to that of Dr. Schmidt.  R0075 - R0077.  However, Dr. Schmidt's analysis does not reflect such a deviation from reason and common sense such that her analysis reflects that she was driven by bias rather than reason.

The fact that Dr. Schmidt has given several opinions favoring MetLife, as reflected in reported cases, also does not demonstrate bias per se.  Most often, the reported cases present close questions that are hard fought.  The reported cases do nothing to show when or how often Dr. Schmidt renders an opinion which favors a finding of disability.  The reported cases do not entail the conclusion that Dr. Schmidt is unreasonably resistant to a finding of disability.

### F.  Conclusion

Having reviewed the evidence in the administrative record and the ***Glenn*** factors, I must determine whether MetLife's decision to deny benefits to Ms. Hatch was arbitrary and capricious.  Stated differently, I must determine whether MetLife's decision is grounded on any reasonable basis.  ***Kimber v. Thiokol Corp.***,196 F.3d 1092, 1098

(10th Cir. 1999).  The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness - even if on the low end." *Id.* (quoting ***Vega v. National Life Ins. Serv., Inc.***, 188 F.3d 287, 297 (5th Cir. 1999)).

Addressing the ***Glenn*** factors, I find and conclude as follows.  The record does not demonstrate that MetLife had a significant conflict of interest.  MetLife's determination had no financial impact on MetLife.  Thus, this factor carries no weight.

There is a large quantity of quality medical evidence in the record. However, one of the major symptoms of Ms. Hatch's condition, pain, cannot be confirmed fully with objective medical evidence.  This factor weighs in favor of MetLife.

The Plain and MetLife provided its reviewing physicians and other evaluators with all of the relevant evidence.  This factor weighs in favor of MetLife

To some degree, MetLife's ultimate decision to deny benefits necessarily provides greater emphasis on medical reports favoring a denial of benefits.  However, MetLife's reviewers, particularly Dr. Schmidt, also address in their analyses the medical reports which tend to favor a finding of total disability.  Those reports were not ignored or addressed in a cursory fashion.  This factor weighs in favor of a finding of arbitrary and capricious action, but the weight accorded to this factor is small.

Other than the actions of the evaluators in this particular case, the record says nothing about whether the Plan or MetLife took active steps to remove bias and promote accuracy.  This factor carries no weight.

MetLife did not consider the Social Security determination awarding disability benefits to Ms. Hatch.  This factor augurs in favor of a finding of arbitrary and capricious action.

Considering the record as a whole, I find and conclude that MetLife's decision was grounded on a debatable but ultimately reasonable basis.  Addressing particularly August 2005, the relevant point in time, the record contains conflicting medical evidence about Ms. Hatch's ability to work for a significant period of hours at a sedentary job for wage or profit.  Although Ms. Hatch often reported increased pain and fatigue after one or two hours of exertion, that fact does not demonstrate an inability to work at a productive, profitable sedentary job that requires minimal physical exertion.  The record in this case demonstrates that MetLife's evaluation of Ms. Hatch's claim involved a reasoned and principled process.  It was not arbitrary and capricious for MetLife to rely on the opinions of its medical consultants. The opinions of those consultants, particularly Dr. Schmidt, provide a reasonable factual basis for MetLife's denial of benefits. The ultimate determination of MetLife falls within the continuum of reasonableness, was amply circumstantiated, and thus was not arbitrary or capricious.

## VIII.  CONCLUSION & ORDERS

I have reviewed the plaintiff's claim that the defendants' termination of her disability benefits was arbitrary and capricious. I conclude that the plaintiff has not demonstrated that the defendants' termination of her disability benefits was arbitrary and capricious.  I conclude, therefore, that the defendants are entitled to judgment as a matter of law on Ms. Hatch's claims under ERISA for past due benefits and for clarification of her right to future benefits, as stated in her complaint [#1].  In addition, I conclude that Ms. Hatch is not entitled to an award of attorney fees.

**THEREFORE, IT IS ORDERED** as follows:

1.  That the determination of the defendants, the Long-Term Disability Plan of the

May Department Stores and the Metropolitan Life Insurance Company, that the plaintiff,

Helena C. Hatch, is not entitled to disability benefits under the Plan beyond August 12,

2005, is **UPHELD**;

    2.  That the request of the plaintiff, Helena C. Hatch, for an award of attorney

fees is **DENIED**;

    3.  That judgment **SHALL ENTER** in favor of the defendants, the Long-Term

Disability Plan of the May Department Stores and the Metropolitan Life Insurance

Company, against the plaintiff, Helena C. Hatch; and

    4.  That the defendants, the Long-Term Disability Plan of the May Department

Stores and the Metropolitan Life Insurance Company, are **AWARDED** their costs to be

taxed by the clerk of the court in the time and manner provided by FED. R. CIV. P.

54(d)(1) and D.C.COLO.LCivR 54.1.

    Dated March 28, 2013, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge